**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREENWALD CATERERS INC.,** | : | **CIVIL ACTION** |
| **NEW YORK UNITED JEWISH** | : | |
| **ASSOCIATION, INC.** | : | |
| | : | |
| **v.** | : | **NO.  22-811** |
| | : | |
| **LANCASTER HOST, LLC** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                          **October 25, 2023**

We return again to the case of the Passover celebration gone wrong.  In 2019, the plaintiffs organized, catered, and hosted a large, multi-day Passover event for Orthodox Jewish families at the defendant's hotel in Lancaster, Pennsylvania.  Plaintiffs booked the entire hotel for Passover — a deal worth over $400,000.  The booking was memorialized in a contract, which plaintiffs say the defendant breached by providing ruinous rooms and common spaces. Plaintiffs not only want their money back, but they also want compensation for various other direct and consequential losses, as well as lost profits they attribute to fallout from the disastrous 2019 event.

Contentious litigation has brought us to cross-motions for summary judgment as well as *Daubert* motions.  Plaintiffs say that the breaches are so clear that we may enter judgment in their favor on liability and proceed to a trial on damages.  Defendant says that plaintiffs' damages theories lack factual basis and nexus to the alleged breaches — and that plaintiffs' liability and damages experts fail the clear the bar of Rule 702.  On the sweeping issues of liability and damages, we cannot grant either motion because a jury needs to determine exactly

what, if any, breaches occurred, and exactly what, if anything, those breaches are worth. That

said, defendant correctly identified several problems with plaintiffs' case as it stands, and we

were able to narrow certain issues for trial. We deny plaintiffs' motion; grant defendants'

motions in part; and move this case a step closer to trial.

## I.   Background

This case has spawned several opinions that summarize the background of the dispute.

*E.g.*, *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235 (E.D. Pa. Apr. 22,

2022) (dismissing most of plaintiffs' claims); *Greenwald Caterers Inc. v. Lancaster Host, LLC*,

2023 WL 3097211 (E.D. Pa. Apr. 26, 2023) (dismissing plaintiffs' implied warranty claim). To

recap:

> Plaintiff Greenwald Caterers, Inc. ("Greenwald") "is a high-end caterer who has
> for decades served the needs of the Orthodox Jewish Community," "has been
> involved in organizing hotel programs and [K]osher tours around the world for
> over thirty years," and "specializes in custom [K]osher celebrations." DI 15 ¶ 1.
> Defendant Lancaster Host, LLC d/b/a Wyndham Resort Lancaster ("the [Hotel]")
> owns and runs a hotel formerly known as the Lancaster Host Resort located in
> Lancaster County, Pennsylvania. *Id.* ¶ 4. Greenwald has held an annual Passover
> event at the [Hotel] since 2008. *Id.* ¶ 4. Plaintiff New York United Jewish
> Association, Inc. ("Association") "is a not-for-profit entity that collaborated [on
> the 2019 Passover event] with Greenwald" by paying for its members to attend.[1]
>
> In 2018, the [Hotel] became a Wyndham franchisee and rebranded as the
> Wyndham Lancaster Resort & Convention Center. *Id.* ¶ 10. As part of the
> rebrand, the Hotel underwent renovations to meet Wyndham "resort standards."
> *Id.* ¶ 11. Amidst renovations in late 2018, Greenwald and the [Hotel] negotiated a
> five-year contract (the "contract") for future Passover events "at what was to be
> the newly renovated Wyndham hotel." *Id.* ¶¶ 7, 8, 11. The contract covered
> annual Passover events at the [Hotel] through 2023 and "included many clauses
> intended to satisfy the needs, requirements, concerns, desires, etc.," of Greenwald
> and its attendees. *Id.* ¶ 50. Among other things, the contract provided for:
> Greenwald's exclusive use of the entire hotel except for select common areas,
> clean common bathrooms, daily housekeeping, linen rentals, linen cleaning, linen

---

[1] DI 15 ¶¶ 2, 3, 38. We refer to Greenwald and Association together as "plaintiffs."

changes, room phones, Wi-Fi internet, pre-event room inspections, and Kosher preparations of kitchen facilities and guest rooms. *Id.*

The [Hotel] repeatedly assured Greenwald that it would be ready for the April 2019 Passover event in the months and weeks leading up to the holiday. *Id.* ¶¶ 11, 54, 79, 80, 81. But when Greenwald and the 2019 Passover attendees arrived for the event, they discovered the [Hotel] in "disarray." *Id.* ¶ 96. Among other things, attendees encountered in their rooms: cat crates, cat litter, a "deeply inundating" smell of cat waste, plumbing issues, lack of water, sewage backups, mouse droppings, cockroaches, vermin, exposed nails, uncovered electrical outlets, mold, exposed lead paint, construction dust, non-functioning air conditioning, unmade beds, misplaced or missing furniture and beds, missing cots, missing doors, non-Kosher cooking utensils and cooking equipment, and inoperable telephones. *Id.* Families who had requested adjoining rooms or blocks of rooms were separated. *Id.* ¶ 100. Others found themselves assigned to rooms in the middle of other family blocks. *Id.* The [Hotel] provided infrequent and insufficient housekeeping. *Id.* ¶ 129. Attendees who complained to the front desk were "rudely" rebuffed. *Id.* ¶ 102.

Problems plagued the event beyond the attendees' rooms. To Greenwald's "dismay[]," the kitchen facilities were unfinished and did not meet the Kosher specifications set forth in the contract. *Id.* ¶ 109. The dining linens were "wrinkled" and "malformed," and the Hotel's laundry and press facilities were "not operational." *Id.* ¶¶ 113, 114. Throughout the building, "ceiling tiles were missing" and "electrical wires were exposed." *Id.* ¶ 116. Construction debris and equipment littered the premises. *Id.* Various spaces reserved for Greenwald's use in the contract were unfinished or unusable. *Id.* The [Hotel] did not have a "functioning Sabbath elevator . . . until the middle of the program," though the contract called for one. *Id.* ¶ 120.

To "make the best" of the "nightmare" at the [Hotel], Greenwald had to hire extra staff for the duration of the event, place some guests at a neighboring hotel, provide free food to guests, secure generators and fuel, rent new linens, and "build[] a kitchen facility outside of the hotel" at its own cost. *Id.* ¶¶ 14, 94, 105, 107, 111, 112, 113.

To recover its alleged damages from the 2019 Passover event, which left attendees "disappointed, disgusted, and insulted," Greenwald brought this suit in March of 2022. *Id.* ¶ 146; *see* DI 1.

*Greenwald*, 2023 WL 3097211, at *1-2. The case centers around a February 2019 contract

made between plaintiffs and the Hotel.[2]   The contract defines certain terms used throughout this opinion:

- **Greenwald**: plaintiff Greenwald Caterers, Inc.
- **Association**: plaintiff New York United Jewish Association Inc.
- **Hotel**: defendant Lancaster Host, LLC.
- **Group**: Greenwald and Association, collectively.
- **Party** or **Parties**: either the Group or Hotel individually or collectively.
- **Group event**: "a Passover holiday event held by the Group at the Hotel under the terms and conditions of th[e] contract."
- **Group members**: "[a]ny and all individuals who attend a Group event."

Contract at 1.  We are here because plaintiffs say the Hotel breached the contract and they want their money back, as well as various forms of damages they say arose from the breach.

Having proceeded through discovery, both plaintiffs and the Hotel file for summary judgment.  Plaintiffs seek partial summary judgment on liability, proposing to leave damages for trial.  DI 120.  The Hotel seeks summary judgment on all of plaintiffs' claims, albeit with a focus on damages rather than liability.  DI 118.  The Hotel also moves to exclude all three of plaintiffs' experts from testifying at trial.  DI 122 & 135.  Rather than introduce all the pending motions and attempt to summarize all of the relevant factual background, we take up the facts as needed to decide the issues advanced by the parties.

## II.  Summary Judgment Standard

"Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (cleaned up); *see* Fed. R. Civ. P. 56(a).  "Material facts are those

---

[2] The contract is available at DI 1-1, and will be cited as "Contract" using its own pagination, shown at the upper left.

that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (cleaned up).  We do not weigh evidence or make credibility determinations.  *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021).

"The party seeking summary judgment has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact." *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (cleaned up); *see Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n.3 (3d Cir. 1998) ("The movant has the burden of pointing out that evidence cognizable in a motion for summary judgment which the movant believes entitles it to summary judgment . . . .").  If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.  Plaintiffs' Motion for Partial Summary Judgment on Their Own Claims Is Denied

Plaintiffs move for partial summary judgment as to liability on counts I, V, and VI of their operative complaint: (A) breach of contract (in turn proposing to leave damages for trial); (B) declaratory judgment that defendant is not entitled to enforce terms of the contract against plaintiffs due to its material breaches; and (C) declaratory judgment that defendant (rather than the hotel guests) is responsible for certain poor conditions at the hotel.  We deny plaintiffs' motion on all three grounds.

###### A. Breach of Contract

Plaintiffs enumerate eleven categories of breach and argue that there is no dispute of fact as to each: (1) rooms and facilities; (2) housekeeping; (3) room block; (4) room rates and occupancy; (5) kosher requirements; (6) elevators; (7) reservation method; (8) phone and wi-fi services; (9) cancellation; (10) security deposit; (11) additional covenants.  DI 120.  Under Pennsylvania law, to prevail on a claim for breach of contract, a plaintiff must establish: "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and, (3) resultant damages."  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).  The focus here is breach.  Plaintiffs failed to establish breach as a matter of law in any of the categories listed above, which we will take in turn.

**Rooms and facilities and the room block clause.**  Plaintiffs' lead argument is breach of the check-in/out time, condition of rooms upon check-out, function space, and rooms and property clauses of the contract.  They break out the room block provision separately, but it is better addressed with the others, because they all relate to plaintiffs' central theory that the Hotel fundamentally did not deliver on what it agreed to, and what plaintiffs paid for: the rooms and function space for the Passover event.

At a basic level, the contract is for a reservation of an estimated number of rooms over a stretch of two weeks.  Contract at 2.  The contract specifies many requirements for the rooms and common spaces particular to plaintiffs' needs.  Plaintiffs make allegations of breach specific to some of those individual provisions, and those are discussed below.  But the thrust of plaintiffs' breach of contract claim is much simpler and based on what the Hotel's own witness

6

called "common sense."  DI 120-1 at 18.  As plaintiffs explained:

> In fact, both Hotel management and Plaintiffs understood the Contract's main
> provisions in the same way based on the plain meaning of the words "hotel" and
> "hotel room" as well as their course of dealing over nearly a decade of Passover
> programs.  All parties understood that the Hotel would be free from construction
> debris, vermin, cats and cat accoutrements, sewage, leaks, etc., and with working
> pluming, sewer, electric, HVAC, furniture, bedding, telephones, doors, and so
> forth.

> The parties understood that the Contract required at least minimal standards
> within the hospitality industry, and that this meant a level of finish and suitability
> for purpose that a hotel would be expected to provide.

*Id.* at 17.  Plaintiffs' central theory is not a matter of "necessary implication," "implied obligation

of good faith," or any other collateral doctrine of contract law, as the Hotel suggests.  DI 127 at

2-5.  It's just a question of whether the Hotel delivered on the promised hotel rooms and event

spaces, as the pertinent contract terms are ordinarily understood.  *Kripp v. Kripp*, 849 A.2d 1159,

1163 (Pa. 2004) ("In cases of a written contract, the intent of the parties is the writing itself.  If

left undefined, the words of a contract are to be given their ordinary meaning.").

But that is where we depart from plaintiffs' view of things in two important ways.  First,

we do not adopt here any extra-contractual set of standards for hotel spaces, and certainly not the

"Wyndham standards" that plaintiffs have often referenced in this litigation (if there is such a

thing).  Plaintiffs have given us no persuasive reason to depart from the ordinary understanding

of hotel "room" and other contract language at issue.

Second, as a whole, plaintiffs' proposal to enter summary judgment on breach of contract

here is unsustainable.  Plaintiffs list 14 alleged deficiencies with the hotel spaces that they say

"were experienced by hundreds of guests across 100 plus rooms."  DI 120-1 at 15-16.  The first

one, for example, is that "[t]here were plumbing issues and sewage backed up in the bathtubs,

toilet areas and bathrooms in many of the rooms."  *Id.* at 15 (citing DI 120-2 ¶ 61(e)).  The cited

proposed undisputed fact, in turn, relies upon the affidavits of Messrs. Neger, Biderman, Herskovits, and Wolf.  DI 120-2 ¶ 61(e).  The Hotel's witnesses disagree.  They testified that the plumbing problems were the fault of the Group members.  DI 127 at 14-16.  And so it goes with the other thirteen bullet points on plaintiffs' list of problems.  In short, whether the Hotel breached its side of the reservation contract is disputed and not amendable to summary judgment.[3]  Below, we will briefly address contract provisions that plaintiffs called out and argued separately.

**Housekeeping.**  Plaintiffs argue that the Hotel undisputedly breached the housekeeping-sabbath provision of the contract.  DI 120-1 at 18-19; Contract at 2-3.  That part of the contract provides that "Hotel staff shall clean and vacuum each Group member's room at least once a day, unless the Group member places a 'do not disturb' sign on the door."  Contract at 3. Plaintiffs rely upon affidavit testimony of guests as well as Hotel records said to show insufficient housekeeping staff.  DI 120-2 ¶¶ 71-74.  The Hotel demonstrated the presence of a factual dispute on these allegations through the testimony of Hotel witnesses Kalpesh Vakil and Harry Stevens, and therefore, summary judgment on this basis is denied.  *E.g.*, DI 120-3 at 234-35, 261 (ECF) (Messrs. Vakil and Stevens testifying that staffing was sufficient).[4]

**Room rates and occupancy.**  Plaintiffs allege breach of two parts of the room rates and occupancy provisions of the contract.  DI 120-1 at 19-20; Contract at 3.  First, they argue that

---

[3] Plaintiffs' reply brief presents a litany of comebacks to the Hotel, but they serve to further swamp the issues in factual disputes rather than clarify for summary judgment.  It is a jury's function — not ours — to determine whether the testimony and photographs relied upon by plaintiffs amount to breach of contract.

[4] The notation (ECF) means that the page numbers refer to the page numbers added by the court's ECF system at the top of each page of a filing.

the Hotel did not abide by the agreement that "[e]xisting furniture will not be removed from any guestroom." DI 120-1 at 19; Contract at 3. Plaintiffs appear to assume without explanation that this obligation applies to the Hotel, but as the Hotel points out, it clearly applies to the Group and acts to prohibit guests from removing furniture, e.g., to make space for cots or cribs. Even if the provision did apply to the Hotel, plaintiffs' factual allegations are that rooms lacked furniture, which does not establish breach of a prohibition against removing existing furniture. DI 120-2 ¶¶ 69-70.

Second, plaintiffs argue that the Hotel failed to "change linen[s] every 3rd day, except to the extent otherwise requested by a Group member." DI 120-1 at 20; Contract at 3. The gist of this alleged breach was already addressed above under the housekeeping umbrella. This additional piece does not help because here, the factual allegations advanced by plaintiffs are only that "[n]ormal hotel rooms have clean linens." DI 120-2 ¶ 16(f) (cited at DI 120-1 at 20). Even if undisputed and considered a "fact," that allegation obviously cannot establish breach.

**Kosher requirements.** Plaintiffs' argument on this point is a single line: "Defendant failed to provide, establish, maintain, or enable agreed upon specifications required for the Passover Kosher event in that various guest rooms had non-Kosher food and utensils." DI 120-1 at 20. The only reference to a contractual provision is buried in plaintiffs' statement of facts, which refers to the room block provision of the contract. DI 120-2 ¶ 61(a); Contract at 2. The "room block" provision provides the estimated number of rooms that will be available on any particular date. Contract at 2. It is unclear how plaintiffs' argument bears on this contractual provision, nor does the affidavit evidence cited demonstrate breach.

**Elevators.** The contract provides that "[i]f needed, the Hotel will man the elevator

during specific dates and times mutually agreed upon by the Group and the Hotel."  Contract at

10.  Plaintiffs allege that the Hotel failed to provide the Sabbath elevator for the entire duration

of the event.  DI 120-1 at 20.  As the Hotel points out, on its face, plaintiffs' argument does not

square with the language of the contract.  DI 127 at 22-23.  Furthermore, plaintiffs' affidavit

evidence is vague and fails to demonstrate breach.  For example, Mr. Wolf averred that "[t]he

elevator was not working," but it is unclear what the nature of the problem was, when or how

often it occurred, and how exactly that connects to contract provision.  DI 120-12 ¶ 7.

 **Reservation method.**  Plaintiffs next allege that the Hotel breached the contract's

provision that the Group will provide the Hotel with a rooming list, and "[t]he Hotel does not

guaranty special requests will be granted, but will endeavor to make its best efforts to

accommodate such requests."  DI 120-1 at 20; Contract at 4 (under the heading "reservation

method").  Plaintiffs argue that the Hotel "simply disregarded pre-made room arrangements and

put guests wherever it could or would" and that this failed to constitute "best efforts" because

the Hotel had, in the past, "easily managed such room reservations."  DI 120-1 at 21.  The

argument appears to assume that abiding by the rooming list constitutes one or more "special

requests."  Regardless, at a minimum, the Hotel demonstrated a dispute of fact as to whether it

made best efforts under the circumstances.  *See* DI 127 at 23-24.

 **Phone and wi-fi services.**  The contract provides that certain phone service is "free and

based on availability" and that "[g]uest room wifi will be provided to Group members at no

charge."  Contract at 4 (further stating that "no refund, credit, or discount will be provided if

phone or Internet service is not sufficient or is interrupted").  Plaintiffs argue that "[m]any of the

guest rooms lacked working telephones."  DI 120-1 at 21 (citing in turn to an affidavit saying

"**some**" rather than "**many**" telephones, DI 54 ¶ 27).  Plaintiffs have not explained how "some" telephones not "working" constitutes a breach of contract in light of the "based on availability" and "no refund" qualifiers in the contract.

**Cancellation.**  Plaintiffs next argue that the Hotel breached the contract's cancellation clause, which provides a schedule of fees the Group must pay if it cancels an event.  DI 120-1 at 21-22; Contract at 12.  But, as the Hotel points out, the cancellation clause obligates the Group, not the Hotel.  DI 127 at 26-27.  Plaintiffs instead point to some underlying "contractual duty of good faith and fair dealing" that the Hotel violated, causing the plaintiffs to miss the chance to cancel the event and avoid paying a fee (a fee that the plaintiffs never paid because they never canceled the event).  DI 120-1 at 22.  Plaintiffs' argument fails to even allege a breach of contract, much less provide a basis for summary judgment.

**Security deposit.**  The contract provides for a security deposit of $30,000 that was "[d]ue upon signing of the contract and will not be applied to anticipated prepayment balance." Contract at 4.  The deposit was to be "refunded seven (7) days after the Group event, but only after deducting amounts from the refund to cover any and all damages or loss caused by or attributable to the Group."  *Id.* at 5.  The Hotel attributed $35,164.58 of damages to plaintiffs and retained the security deposit.  DI 120-1 at 22.  Plaintiffs argue that the Hotel breached the security deposit clause by charging plaintiffs, rather than the Group members individually, for $25,052.49 attributed to clogged sewer lines.  *Id.*

The contract addresses the possibility of damage caused during the Group event in several ways.  First, with respect to damage to guest rooms, the guest is responsible first with plaintiffs as a fallback:

>At the conclusion of a Group event, the cost of any damage or repairs to a guest room caused by a Group member will be individually charged to the Group member, provided the Group member has a credit card on file with the Hotel.  For any reason, if the Group member denies to pay or declines credit card, the Group will be responsible for any such payment.

Contract at 4.  Second, as mentioned, the security deposit covers "any and all damages or loss caused by or attributable to the Group."  *Id.* at 5.  Third, damage to common resources like kitchen equipment, doors, fixtures, and elevators are the responsibility of the Group.  *Id.* at 10. Taken as a whole, the clear intent is for hotel *guests* to be primarily responsible for damage to *guest* rooms, and for the Group to be solely responsible for damage to common resources and areas.  It is at least disputed (if not entirely clear) that the sewer lines are a common resource that plaintiffs are solely responsible for under the contract.  *E.g.*, DI 120-3 at 224 (ECF) (Hotel's employee Mr. Vakil testifying that it was impossible to attribute the sewer line clogs to particular Group members).  Thus, summary judgment is denied on this point as well.

**Additional covenants.**  Plaintiffs' last argument for summary judgment of breach draws from a list of ten contractual promises by the Hotel under the heading "additional covenants." Contract at 8-9.  In particular, plaintiffs point to: damaged ceiling tiles, unclean or unmaintained corridors and common areas; failure to inspect for bedbugs (not an actual bedbug problem, just the failure to inspect); and the presence of construction work during the Group event.  DI 120-1 at 23-24.  Most of these contentions may be disregarded because plaintiffs brief cites to no evidence to carry its burden.  *Id.*  The exception is the point about unclean or unmaintained corridors and common areas, but those allegations are subsumed by our earlier discussion of plaintiffs' central focus for breach of contract, and summary judgment is denied for the same reasons.

### B.  Declaratory Judgment as to Material Breach (Count V)

Plaintiffs seek a declaration that the contract "should be deemed non-binding on the Plaintiffs" because of "Defendant's many breaches of the contract."  DI 15 ¶ 302.  Such a declaration would, according to plaintiffs, "deny[] Defendant any benefit imparted by the Contract."  *Id.* at 63.  In particular, plaintiffs argue that the contract cannot be enforced against them to allow defendant to retain the security deposit or make certain arguments against their damages theory.  DI 120-1 at 28.  Because we denied plaintiffs' motion for summary judgment on breach of contract, we necessarily also deny plaintiffs' motion for summary judgment on Count V.

### C.  Declaratory Judgment as to Responsibility for Poor Conditions (Count VI)

Plaintiffs also seek a declaration against the Hotel imposing liability "for any and all actual and/or alleged damage, repairs, alterations or clean-up related to Passover 2019 upon Defendant" only.  DI 15 at 65.  Further to that, plaintiffs ask for summary judgment that any damages the Hotel might claim are the result of its own breaches and not caused by plaintiffs or any Group members.  DI 120-1 at 29.  As with Count V, because we denied plaintiffs' motion for summary judgment on breach of contract, we necessarily also deny plaintiffs' motion for summary judgment on Count VI.

## IV.    The Hotel's Motion to Exclude Experts Is Granted in Part and Denied in Part

The Hotel moves to preclude three of plaintiffs' experts from testifying at trial: Messrs. Gorodesky, Kostival, and Molder.  We grant the Hotel's motion in part.  Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The court serves a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). The Third Circuit has boiled down Rule 702 into three requirements: (1) the witness must be qualified to opine on her chosen topic (expertise); (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (reliability); and (3) the expert's testimony must assist the trier of fact (fit). *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit.").

A witness is *qualified* to provide expert testimony only if the witness has "specialized expertise" in the testimony's subject matter. *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). This is a liberal standard. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

*Reliability* means an expert's opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation' [and] the expert must have 'good grounds' for his or her belief." *Elcock*, 233 F.3d at 745 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) (*Paoli II*)). The expert's conclusion is not the focus, but rather her methodology, and we consider whether that method is reliable, reproducible, explainable, and accepted. *Paoli II*, 35 F.3d at 746. Furthermore, an "expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Elcock*, 233 F.3d at 754.

14

Finally, *fit* gets at whether the method was reliably applied to the facts of the case.  The testimony "must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (cleaned up).  The "ultimate touchstone" in evaluating admissibility under Rule 702 is "helpfulness to the trier of fact." *Paoli II, 35 F.3d at* at 744.  An expert who renders an opinion based on factual assumptions not present in the case "cannot be said to 'assist the trier of fact,' as rule 702 requires." *Elcock*, 233 F.3d at 756 n.13.  Consequently, "[t]his type of an opinion misleads the fact-finder and arguably does not comply with the 'fit' requirement[.]" *Id.*

The party offering the expert testimony carries the burden of establishing that it meets these three requirements by a preponderance of the evidence.  *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).  That said, "[i]f the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997).

### A.  Ronald N. Gorodesky (Liability) Is Precluded from Testifying

Mr. Gorodesky "has over 40 years of experience in various aspects of the hospitality industry . . . with particular emphasis on the multiple aspects of the hotel and food service industry." DI 122-1 at 26 (ECF).  He signed an expert report dated April 7, 2023 constituting a scant four pages.  *Id.* at 22-25 (ECF).  He looked at photographs, affidavits, videos, and a few other materials, and he stayed at the Hotel in December 2022.  *Id.* at 23 (ECF).  Mr. Gorodesky describes his methodology as follows:

> Our assignment in this case is to determine whether the Host was a first-class full-service hotel for the Plaintiff and Plaintiffs guests for the Event.  We can only rely on the information reported by Plaintiffs contained in the documents listed above.

In our experience, to obtain and maintain a franchise from a major hotel chain like Wyndham Hotels, a vigorous and lengthy inspection must be performed at regular intervals with any deficiencies corrected.  Despite Plaintiffs request for evidence of those inspections, they have yet to be provided.  We therefore assume that such reports were not presented as they were unfavorable to the Hotel.

*Id.* at 23-24 (ECF).  Mr. Gorodesky then refers generally to "industry standards" and opines the following:

Incredibly, the Host did not meet the minimum standard for even an economy limited service hotel.  Most notably, reports of backed up sewage, overflowing toilets and failing HVAC systems would fail any reasonable hotel standards inspection.

Certainly hotels sometimes have areas of construction.  But these areas are cordoned off from guest traffic for both safety and appearance reasons.  Carpet installation, plumbing work, electrical work and furniture installation often happen while the hotel is open, but not in an occupied guest room or in occupied common areas.

Hotels also regularly experience failing mechanical systems in public areas and guestrooms.  It is customary for hotels to relocate the guests to either other rooms within the hotel [or] relocate them to another hotel.  It is also customary in that situation to not charge the guest for their stay, and if relocated, the hotel would pay the new hotel's charges.

Typically, horrific events like sewage backing up into occupied rooms bathrooms would cause the hotel operator to offer a full refund of the stay plus significant additional cash or future stay compensation in light of the experience. . . .

Based on the documents reviewed, the Host was not ready to accept guests.  The horrific experiences described in the documents fall far short of quality expectations for first class hotels.

Cleanliness and sanitation certainly did not meet minimum standards.  Cat litter, cat waste odors, mouse droppings and cockroaches were reported by the Plaintiff.

The documents also describe significant housekeeping failures that certainly do not meet Wyndham standards or any reasonable hotel quality standard.  My own positive experience at my December 2022 stay did not have any of the negative features described in the documents; clearly the failures at the Event were not the accepted norm.

Guest rooms and public areas were both significantly affected by mechanical

16

issues.  Sewage backups and HVAC failures at the Host during the Event
certainly impacted the Passover celebration that was the purpose of the gathering.

*Id.* at 24-25 (ECF).  Mr. Gorodesky then concludes that "the Host was not ready to accept

guests" and that "[t]he documents also describe significant housekeeping failures that certainly

do not meet Wyndham standards or any reasonable hotel quality standard."  *Id.* at 24.

The Hotel argues that Mr. Gorodesky's opinions fail the Third Circuit's reliability and fit

requirements for experts.[5]  DI 122-1 at 2.  With respect to reliability, the Hotel faults Mr.

Gorodesky's reliance on unverified second-hand evidence, his stated use of an adverse inference

against the Hotel, and his failure to state the standards against which he judged the Hotel.  *Id.* at

2-5.  With respect to fit, the Hotel argues that Mr. Gorodesky's comparisons of the Hotel to

unstated industry standards (rather than the contract itself) will not assist the trier of fact in this

breach-of-contract case.  *Id.* at 6.  In response, plaintiffs argue that the evidence Mr. Gorodesky

relies upon is sufficiently probative and reliable to undergird his opinion, and that expert

comparison to industry standards is both routine generally and helpful to the jury in this

particular case.  DI 130 at 8-11.

We agree with the Hotel.  Mr. Gorodesky explains that his remit is to "determine

whether the Host was a first-class full-service hotel for the Plaintiff and Plaintiffs guests for the

Event," but he never actually says what methodology he uses to decide that question.  DI 122-1

at 23-24 (ECF).  It is not enough for an expert to state the information she considered and then

state her conclusion — Rule 702 requires an intermediate step of setting forth a comprehensible

---

[5] Mr. Gorodesky's resume evinces specialized expertise.  But the Hotel correctly points
out that the expert report does not relate Mr. Gorodesky's qualifications to his remit.  For
purposes of the Hotel's motion, we assume that Mr. Gorodesky is qualified to testify on
whatever topics plaintiffs suggest.

methodology capable of transforming information into a conclusion.  Taking Mr. Gorodesky's report as a whole, with some help from plaintiffs' briefing, we surmise that Mr. Gorodesky's methodology is to adopt a certain accepted standard for hotel upkeep, and then compare the conditions at the Hotel to that standard.  The problem is that the jury will have no idea what "standard" Mr. Gorodesky is using, where that standard comes from, or what it might require or suggest.  Mr. Gorodesky himself varyingly refers to the standard he is using as "first-class," "full-service," "minimum," "Wyndham," and "any reasonable hotel quality standard" without any explanation of what these terms mean.  DI 122-1 at 23-24.  We need not dwell on whether his methodology passes muster under Third Circuit law because there simply is no methodology.[6]  *See Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008) (affirming exclusion of expert who "fail[ed] to demonstrate any methodology, let alone peer-reviewed or generally accepted methodology").

A second yet equally dispositive problem with Mr. Gorodesky is that his testimony, as proposed, will not help the jury in this case.  This is a breach of contract case.  Mr. Gorodesky's expert report gives no indication whatsoever that he read the contract or considered its obligations.  Nor is there a clear link between Mr. Gorodesky's proposed testimony and the contract.  The contract nowhere names a set of standards with which the Hotel must comply.  We imagine that in a different, but similar, case, an industry expert might shed light on what is entailed with a promise to provide hotel rooms and event spaces.  But there is nothing even close

---

[6] We are not persuaded that there is anything necessarily wrong with an expert reaching conclusions based on second-hand evidence.  That is commonplace, and expressly allowed by the rules.  *See* Fed. R. Evid. 703.  Whether that would be appropriate (and to what degree) in any given case depends on the expert's remit and the needs of the case.  It does tend to exacerbate the "fit" problem discussed below — as does Mr. Gorodesky's use of adverse inference.

to the foundation necessary for that sort of testimony in Mr. Gorodesky's report.  Nor will Mr.

Gorodesky bring to the jury any evidence or analysis that it has not heard already.  Further, Mr.

Gorodesky's opinion is infected by an adverse inference that plaintiffs never sought and this

court never permitted.  DI 122-1 at 24 ("We therefore assume that such reports were not

presented as they were unfavorable to the Hotel.").

In sum, Mr. Gorodesky's proposed testimony appears to be nothing more than a

groundless *ipse dixit* that lacks both an adequate methodology and adequate fit for this case.  His

testimony will be excluded in its entirety under Rule 702.

### B.  Robert Kostival (Liability) May Testify in Certain Respects

Mr. Kostival has 39 years of experience in the engineering industry, including 19 years

of experience in forensic engineering including plumbing issues.  It appears that Mr. Kostival's

remit is "to determine the cause of plumbing and HVAC system problems, experienced during

the 2019 Passover Event."  DI 122-1 at 36 (ECF).  He considered various documentary and

affidavit evidence, including photographs and videos of plumbing activities, and a memorandum

describing sewer clogs during the event.  *Id.* at 31-32, 35 (ECF).  He ultimately concluded that

he could not reach a conclusion, nor could any other expert based on that record:

> To date, the Defendant has not provided to Plaintiff's counsel the technical
> information, including drawings, specifications, and construction documentation,
> for these existing and renovated Hotel systems.  Therefore, I am prevented from
> conducting a full and proper technical analysis to determine adequacy or
> inadequacy of these systems.  In fact, without this information, no plumber,
> contractor, or engineering expert would be able to forensically investigate either
> Plaintiffs' or Defendant's accounts. . . .
>
> In conclusion, without plumbing and HVAC system drawings, specific locations
> of the affected areas, the locations of plumbing drain unclogging activities and
> materials removed, and the characterization of the removed materials, I am
> prevented from performing the technical analysis, necessary to support a complete

19

forensic investigation that may determine, within a reasonable degree of engineering certainty, the precise cause of the plumbing and HVAC problems and system failures at issue in this litigation.  Moreover, unless and until the Defendant examines such materials itself, the Defendant cannot itself determine with any degree of certainty, much less in accordance with industry-standard forensic investigation methods, what caused the 2019 Passover Event plumbing and HVAC problems.

*Id.* at 36-37 (ECF).

The Hotel argues that Mr. Kostival should be precluded from testifying because he "does not render an opinion to rely on, ostensibly due to his belief that he does not have the information necessary to opine."  DI 122-1 at 7.  In that way, the Hotel reasons, Mr. Kostival's opinions fail the Third Circuit's reliability and fit requirements.  *Id.*  Plaintiffs respond that their intent with Mr. Kostival will be to defend against any allegation by the Hotel that plaintiffs or the Group members caused the sewer clogs.  DI 130 at 12-14.

We agree with the Hotel that Mr. Kostival has not articulated any expert opinion that the plaintiffs may use in their case-in-chief.  At places in the report, Mr. Kostival offers summaries of the evidence that he reviewed, and some speculation, but nothing that satisfies Rule 702's requirement that expert testimony assist the trier of fact.  That said, plaintiffs have persuaded us that there is at least one scenario where Mr. Kostival's testimony might be of value.  If, in its case, the Hotel advances evidence that plaintiffs or the Group members caused the sewer clogs, and that evidence is on par with what Mr. Kostival considered, then Mr. Kostival appears to have the expertise and foundation to testify that the Hotel could not know the true cause and is, itself, speculating.  It is too early to decide exactly what the rules of the road will be at trial, but we expect the parties to discuss this during the pretrial planning process and present any agreements or disputes about how Mr. Kostival may be used in their integrated pretrial memorandum or a motion *in limine*.

### C.  Michael Molder (Damages) May Testify in Certain Respects

Mr. Molder is an experienced damages expert.  The Hotel considers his qualifications "debatable" but has not advanced argument on that front.  DI 122-1 at 8.  His assignment was to calculate plaintiffs' economic losses on the assumption that breach is established.  DI 122-1 at 60-61 (ECF).  In the Hotel's first motion (DI 122) as well as a follow-up motion addressed to Mr. Molder's supplemental report (DI 135), the Hotel seeks to preclude the entirety of Mr. Molder's proposed testimony.  One complication is that these motions are intertwined with the Hotel's motion for summary judgment, and generally speaking, all three are directed at the foundations of plaintiffs' damages case.  But because the standards for *Daubert* and summary judgment are different, the clearest way to address the issues is to first decide what aspects of Mr. Molder's testimony meet the requirements of Rule 702, and then proceed to consider what that means for the Hotel's summary judgment motion.

Mr. Molder opines as follows:

> Greenwald sustained approximately $1,282,162 in damages consisting of approximately $586,961 in direct losses from the 2019 Passover Event, approximately $238,672 in consequential losses related to renewal options on its hotel rental contract, and approximately $456,529 in lost profits from its 2022 Passover program.  Further, to the extent the court allows Plaintiffs to recover prejudgment interest, as of March 31, 2023, the interest accrual is $161,996.

DI 122-1 at 61 (ECF).  His three categories of damages are:

- [Direct losses of $586,961:][7] Out of pocket costs including both the amounts paid to Defendant and the additional costs that Plaintiffs incurred *during* the 2019 Passover Event,
- [Consequential losses of $238,672:] The excess hotel rental cost for the 2022 and 2023 Passover programs because Plaintiffs' customers would not return to the Hotel forcing Plaintiffs to host events during the Contract's renewal

---

[7] Mr. Molder refers to this category of damages as "out of pocket costs" in his report.  DI 122-1 at 65.

periods at alternative locations, and
- [Lost profits of $456,529:] Lost profits resulting from reputational harm attributed to Plaintiffs' Passover programming.

*Id.* at 65 (ECF).  We will take up the details, and the arguments of the parties, on a category-by-category basis.

**Direct losses.**  The direct loss category has several components, by far the largest of which is the money plaintiffs paid to the Hotel, totaling $449,218 (including the $30,000 security deposit).  *Id.* at 65 (ECF).  The remainder comes from refunds issued by plaintiffs to their customers, payments to a neighboring Red Roof Inn for overflow accommodations, and food and entertainment expenses said to be incurred to "help guests enjoy the 2019 Passover Event and not focus on the inadequacies of the Hotel."  *Id.* at 66-67 (ECF).

The Hotel argues that Mr. Molder's direct loss calculations should be excluded because they are nothing more than attempts to introduce inadmissible hearsay evidence through Mr. Molder.  DI 122-1 at 8-13.  Indeed, at his deposition, Mr. Molder explained that this section of his report is not the result of his expert opinion, but rather a recitation of what plaintiffs' counsel told him, and what he understands fact witnesses will prove at trial.  DI 122-1 at 97-98 (ECF).  Plaintiffs do not dispute this.  If the direct losses were the only category of damages, we would be inclined to agree with the Hotel, because allowing Mr. Molder's testimony would be more confusing than helpful, or at a minimum, a waste of the jury's time.  But, if plaintiffs introduce evidence of direct losses during trial,[8] and Mr. Molder testifies on other forms of damages, we will consider permitting Mr. Molder to include the direct loss figures in a final summary of the

---

[8] The Hotel raises serious concerns about the competence of the underlying factual evidence in this category, and certainly has leave to revisit these issues in a motion *in limine* or objections to exhibits.

22

damages in the case, provided that he testifies that he is doing so simply as a matter of convenience and not as the result of his own analysis.

**Consequential losses.** The consequential category derives from the Contract's provision of a renewable option for Passover events in 2020, 2021, 2022, and 2023. Contract at 12-13. These options locked in rate increases of not more than 5% per year, but the catch was that "the Group must exercise each option in sequence." *Id.* at 13. In other words, "[i]f the Group fails to exercise an option, all other [future] options will terminate." *Id.* Mr. Molder extrapolated this 5% increase into 2022 and 2023 to establish what it would have cost plaintiffs to stay at the Hotel in those years. DI 122-1 at 67 (ECF). Then Mr. Molder compared those figures to what the plaintiffs actually paid other venues to stay there — in 2022, at the Equinox Hotel in Manchester, Vermont, and in 2023, at the Doubletree Hotel in Somerset, New Jersey. *Id.* at 67-68 (note that the 2023 Doubletree event accounts for all of the alleged damages). The Hotel is responsible for the difference, Mr. Molder says, because "[f]ollowing the experience in 2019, Plaintiffs' customers have been unwilling to return to the Hotel." *Id.* at 68 (ECF).

The Hotel argues that Mr. Molder's consequential damages opinions should be precluded because they are inherently unreliable and overly speculative. DI 122-1 at 10-12. First, the Hotel argues that Mr. Molder's source data for the 2023 Doubletree Hotel projected costs — a spreadsheet designated Passover Projection 2023_03 27 23 pdf — must be stricken as untimely in light of our March 14, 2023 discovery order (DI 80).[9] *Id.* at 10-11. We disagree because on

---

[9] We said: "[o]ur order granting defendant's motion to compel (DI 71) required plaintiffs to respond to certain discovery requests by February 23, 2023. Plaintiffs are therefore presumptively precluded from introducing, referencing, or relying on any documents that were responsive to the same requests if those documents were (i) within plaintiffs' possession, custody

this record, it appears that the spreadsheet was work product created after the February 23, 2023 deadline from our order, but before the close of discovery. It is not unusual for a damages expert to be provided with that type of information and later rely on it under Rule 703, and that information would be exposed to discovery through any number of means, including deposition of the person who created the spreadsheet and the damages expert.[10]

Second, the Hotel argues that Mr. Molder should not be able to rely on the projections spreadsheet because he did not create it and did not review any of the underlying source documentation. DI 122-1 at 11. Plaintiffs respond that Rule 703 affords Mr. Molder this flexibility in his testimony, and that the bases of Mr. Molder's opinions may be tested at trial. DI 130 at 16. Although plaintiffs have the general principle right, the Hotel correctly points out that the underlying source information includes a *projection* of costs generated by someone who is not an expert witness in this case. Projections are the product of economic analysis — they involve assumptions, estimations, formulas, and the like. Thus, the issue is not so much that Mr. Molder's testimony is improper lay testimony as it is that Mr. Molder's methodology in reaching his opinion on consequential losses is undisclosed and unknowable because key analytical work — the projections — were done by someone else and recorded in a spreadsheet upon which Mr. Molder relied. And Mr. Molder's report reflects no understanding or explanation of

---

or control on or before February 23, 2023 and (ii) not produced by that date. Fed. R. Civ. P. 34(a)(1) & 37. Furthermore, during oral argument on March 10, 2023, counsel for plaintiffs represented that they have produced all documents responsive to the same requests within plaintiffs' possession, custody, or control." DI 80 n.1.

[10] Similarly, at trial the Hotel may elect to cross-examine that fact witness or the expert to expose the problems that the Hotel believes that it identified with the source data.

how that work was done.  Therefore, any testimony from Mr. Molder incorporating the projections falls short of Rule 702's requirements.

And this is where Mr. Molder's supplemental report fits in.  The Hotel filed its motion to exclude Mr. Molder on June 6, 2023.  DI 122.  Ten days later, Mr. Molder signed a supplemental expert report that abandoned the projections spreadsheet for the Doubletree Hotel costs, and instead relied upon the actual expenses, evidenced by checks to the Doubletree dated from December 2, 2022 through May 8, 2023.  DI 129-2 at 136-45 (ECF).[11]  The total amounts were not particularly different (actually, the supplement worked in the Hotel's favor).  But the supplement would go a long way towards curing the problem with the projections spreadsheet, which plaintiffs must have appreciated.  The Hotel argues that we should exclude Mr. Molder's supplemental report because the report itself was untimely, as was production of the underlying checks to the Doubletree.  DI 135 at 4-5 (ECF).  Plaintiffs respond that the late production was appropriate because the information had only then become available, and Rule 26(e) allows (indeed, requires) supplementation of discovery.  DI 140 at 2-3.

Again, plaintiffs have the right principle, but it does not work for them here.  The checks to the Doubletree were all dated no later than the May 8, 2023 close of discovery in this case. *See infra* n. 10; DI 70.  And not only were the checks responsive to the Hotel's discovery requests,[12] but their relevance was also extraordinarily obvious to plaintiffs considering that Mr. Molder placed such heavy reliance on projections of exactly the same expenses — projections

---

[11] Specifically, December 2, 2022; January 3, 2023; February 16, 2023; March 9, 2023; March 30, 2023; April 14, 2023; and May 8, 2023.  *Id.* at 138 (ECF).

[12] *See* DI 118-1 at 70, 75, 84, 86 (ECF).

specifically created for this case as of March 27, 2023.  Plaintiffs have provided no justification (substantial or otherwise) for the late production of the checks or Mr. Molder's supplemental report, and the late production stands to significantly prejudice the Hotel.  Thus, Mr. Molder's supplemental report and the checks will be excluded.  Fed. R. Civ. P. 37(c).

The result of the two foregoing rulings is that Mr. Molder is entirely precluded from testifying about his consequential damages opinions — whether those be rooted in his original or supplemental reports.

**Lost profits.**  Mr. Molder's lost profits analysis focuses on Greenwald's profits after 2019, which he says declined because "many established customers refuse to attend Plaintiffs' Passover programs" and those that attend "continue to demand discounts because of what happened in 2019."  DI 122-1 at 68-69 (ECF).  Mr. Molder's stated goal is to hypothesize a but-for world where plaintiffs continued to use the Hotel after 2019 for Passover events, and then compare Greenwald's profits in that hypothetical world to its actual profits.  *Id.* at 69 (ECF).  The difference, Mr. Molder says, is attributable to the alleged breach of contract.  To get there, first, Mr. Molder uses historical data to estimate Greenwald's revenue growth rate forward into 2020, 2021, 2022 on the hypothesis that the 2019 Passover Event had turned out normally.  *Id.* at 69-70 (ECF).  He then compares the resulting hypothetical 2022 revenue ($2,200,003) to the actual revenue from the 2022 program ($1,032,644) and concludes that Greenwald lost $1,321,359 in revenue.  *Id.* at 70.  Next, he calculates that Greenwald's actual 2022 variable costs were 55.8% of actual 2022 revenue.  *Id.*  From there, one might have expected Mr. Molder to reduce his hypothetical 2022 revenue of $1,321,359 by the 55.8% variable cost estimate to yield $584,041 of lost profits.  But instead, he did the following:

> [t]he variable costs represent approximately 55.8% of revenue.  Thus, had
> Plaintiff generated the lost revenues, the 2022 Passover program would have
> incurred additional expenses totaling approximately $576,215.  Accordingly,
> Plaintiffs sustained lost profits from the 2022 Passover program of $456,429.

*Id.* at 70-71 (ECF).  Mr. Molder elaborates on the $576,215 figure in a footnote but does not

explain why he uses the actual revenue figure instead of the lost revenue figure: "[l]ost revenue

($1,032,644) times 55.8% equals $576,215."  *Id.* at 70, n. 51 (ECF).

In any event, the Hotel seeks to exclude Mr. Molder's lost profits opinion for several

reasons.  First, the Hotel argues that Mr. Molder drastically underestimated actual 2022 revenue

because he based it exclusively on a 200-room Passover event at the Manchester Equinox

instead of also including a 484-room event at the Stamford Hilton.  DI 122-1 at 13-14.

Relatedly, the Hotel argues that Mr. Molder inflated 2022 expenses by relying on a 98.5%

allocation of rental expenses solely to the Manchester event.  *Id.* at 14.  Plaintiffs respond that

Mr. Molder correctly ignored the Stamford event because it was a different sort of event and did

not belong in the analysis, and in any event, the dispute is factual rather than methodological.

DI 130 at 22-23.  We agree with plaintiffs, at least as to the latter point.  Although the Hotel's

criticism appears potentially well-founded, it will not bar Mr. Molder's testimony under Rule

702.

Second, the Hotel argues that Mr. Molder's lost profit opinions are unreliable because

they rely on a spreadsheet — denoted Passover 2022.pdf — containing the 2022 revenue and

cost data, and Mr. Molder has no understanding of how that spreadsheet was created and did

nothing to verify its contents.  DI 122-1 at 15.  Plaintiffs respond the same way as they did with

respect to the projections spreadsheet underlying Mr. Molder's consequential damages opinions:

an expert is entitled to rely on such second-hand information under Rule 703.  DI 130 at 23-24.

27

This time, however, Mr. Molder's testimony survives because, on this record and in relevant part, the Passover 2022 spreadsheet appears to contain financial data (albeit assembled for this litigation) rather than someone else's projection opinions that Mr. Molder does not explain.

The Hotel relies on the Third Circuit's decision in *Montgomery County v. Microvote Corp.*, which concluded that a district court did not abuse its discretion by excluding videotaped expert testimony based on a second-hand document containing someone else's "guestimate[s]" that in turn were not based on "primary data."  320 F.3d 440, 448-49 (3d Cir. 2003).  But *Montogomery County* makes our point and illustrates the distinction between Mr. Molder's reliance on work-product spreadsheets for lost profits and for consequential losses.  The exclusion in *Montgomery County* made good sense for any number of reasons: the expert witness was "not subjected to cross examination," the second-hand document included "guestimate[s]" generated in an unknown manner, and those guestimates were themselves not based on primary data.  *Id.* at 448-49 & n.3.  Here, at least Mr. Molder — if not also the person who created the Passover 2022.pdf spreadsheet — will testify live and be subject to cross-examination, and the current record does not reflect that the spreadsheet contains guestimates or anything else that might render Mr. Molder's lost profits methodology unreliable.  For that reason, we will deny the Hotel's motion as to Mr. Molder's lost profits opinion.

To sum up the result of the Hotel's motion to exclude Mr. Molder, we grant the motion with respect to consequential losses; deny with respect to lost profits; and deny with respect to direct losses with the understanding that at most, Mr. Molder will be able to include any direct losses demonstrated at trial in a final summary slide.

**V.      The Hotel's Motion for Summary Judgment Is Granted in Part and Denied in Part**

The Hotel moves for summary judgment on all of plaintiffs' remaining claims, although the focus in largely on plaintiffs' damages theories.  DI 118.  We will address the breach of contract issues first, and then touch on the two counts for declaratory judgment.

**A.  Breach of Contract (Count I)**

The Hotel argues that summary judgment is warranted on plaintiffs' breach of contract claim because plaintiffs cannot identify a term in the contract that was breached such that either plaintiff incurred any damages.  DI 118-1 at 8.  First, the Hotel argues that at best, plaintiffs have only identified a few provisions of the contract where there is a factual dispute over breach, such as those relating to maid services, Sabbath provisions, restroom services, plumbing, and accommodation of room requests.  *Id.* at 9.  Second, the Hotel argues that even assuming breach of those few provisions, there is no connection between the breach(es) and any damages incurred.  *Id.*

Unlike in plaintiffs' motion, in the Hotel's motion, the question of exactly which, if any, provisions of the contract were breached (or, more specifically, for which alleged breaches there is a genuine dispute of material fact) does not much factor into the substantive arguments.  The Hotel's point is more directed toward the lack of nexus between various alleged breaches and plaintiffs' damages theories.  The Hotel breaks its brief down by categories of damages (originally identified as such by plaintiffs in the complaint), so we will address the issues the same way.  Plaintiffs do not exactly respond point-by-point, which we take to mean that plaintiffs have narrowed their damages theory since the time of the complaint.

**Lost profits.**  The Hotel seeks summary judgment of no lost profits because: (i) Mr.

29

Molder's opinion is inadmissible and (ii) absent his expert testimony, there is no competent evidence that can establish lost profits.  DI 118-1 at 10-14.  Plaintiffs disagree, but the problem is largely short-circuited by our denial of the Hotel's motion to exclude Mr. Molder's lost profits opinion.  For the sake of clarity — and plaintiffs do not appear to dispute this — plaintiffs advanced no basis to seek lost profits from the jury *other* than that which Mr. Molder can establish consistent with his expert report and underlying factual evidence.  The Hotel also argues that the "conflict" between the complaint's demand for 5 to 10 million dollars in lost profits and Mr. Molder's much smaller suggested amount — and the lack of support in the record for the larger amounts — warrants summary judgment because "Greenwald cannot keep its numbers straight."  *Id.* at 13.  We do not agree, and the Hotel has not advanced any authority preventing a plaintiff from scaling back its damages case in expert discovery.

**Member reimbursements and refunds.**  Next, the Hotel argues that the only evidence of member refunds is a single check for $11,123 to Mr. Monton Paneth that cannot form the basis for damages because (i) there is no evidence of why the refund was issued and (ii) the refund was issued by the Association to Mr. Paneth, but the money originally came from Mr. Paneth, and thus there were no damages to the association by returning it.  DI 118-1 at 14-15.  Plaintiffs respond that the correct figure is $21,123.  DI 129 at 23.[13]  As to the nature of the $11,123 check to Mr. Paneth, plaintiffs' evidence is only the check itself, with no testimony or

---

[13] Plaintiffs' factual allegations on this point actually total up to $22,123, but the $1,000 discrepancy appears to be immaterial to the Hotel's motion or plaintiffs' response.  *See* DI 129-1 ¶¶ 15-17.  For purposes of its moving papers on summary judgment, the Hotel does not challenge the alleged damages accounting for the $11,000 difference between $22,123 and the $11,123 check to Mr. Paneth.

other documentation that might shed light on why the check was written.  DI 129-1 ¶ 16.[14]  We therefore conclude that plaintiffs failed to demonstrate a genuine dispute of material fact that the Hotel could be liable for the $11,123 payment to Mr. Paneth, and grant summary judgment to the Hotel on that piece of the damages theory.

**Reimbursement of costs incurred to hold the 2019 Passover Event.**  The Hotel next focuses on plaintiffs' demand for reimbursement of costs incurred to hold the 2019 Passover Event.  The Hotel argues that nothing in the contract required the Hotel to pay for food, beverages, supplies, or entertainment, and that in any event, plaintiffs "generated $422,845 in profit from the 2019 Passover Event."  DI 118-1 at 15-16.  Plaintiffs do not respond to this argument, which the Hotel treats as distinct from plaintiffs' seeking of a refund for what they paid the Host, and for "extra" costs associated with guest entertainment.  Thus it appears that summary judgment is warranted as to this category of damages.

**Option-related damages.**  The Hotel argues that it cannot be liable for any damages stemming from plaintiffs' decision not to exercise their option under the contract for 2020 (or any year after that) because (i) the choice was entirely in plaintiffs' hands and (ii) plaintiffs have adduced no evidence tending to show that Passover events in 2020 or beyond at the Host would have been profitable.  DI 118-1 at 16-17.  Plaintiffs respond that (i) their obligation to exercise the option in 2020 or 2021 was excused by the contract's force majeure clause in light of the COVID-19 pandemic and (ii) the $195,800 amount of damages will be shown through Mr. Molder.  DI 129 at 26; DI 129-2 at 137 (ECF).  We agree with the Hotel.  Under the plain terms

---

[14] As the Hotel points out in its response to plaintiffs' factual statement, there was no affidavit from the Paneth family or other record evidence supporting plaintiffs' statement.  DI 137-1 ¶ 16.

of the contract, there is no duty to exercise the option, and to the extent that the COVID-19 pandemic justifies plaintiffs' choice not to exercise the option, that exigency would work equally to excuse the Hotel from its obligations on the other side of the option.  Plaintiffs advance no authority — under Pennsylvania law or otherwise — tending to support their proposed right to an option that springs up and obliges the Hotel after the pandemic.  We therefore grant summary judgment in favor of the Hotel on any option-related damages.

**Refund to plaintiffs.**  The Hotel next argues that plaintiffs cannot receive a $419,218 refund for money paid under the contract for three reasons: (i) the plaintiffs do not have standing to obtain the refund because they were merely pass-throughs for money that originated with the Group members; (ii) a full refund cannot possibly be supported by the evidence because plaintiffs have demonstrated inadequacies in only six hotel rooms; and (iii) there is no evidence that plaintiffs issued refunds to guests who occupied those six rooms.  DI 118-1 at 17-18.  In response, plaintiffs first argue generally that the nature of their business is irrelevant to the basic question of whether they did or did not receive the benefit of the bargain for the money they paid the Hotel.  DI 129 at 8-10.  Similarly, plaintiffs argue that it does not matter whether they made refunds relating to the six rooms.  *Id.* at 27-28.  Plaintiffs further argue that the breach was more substantial than six rooms, and included portions of rooms in other blocks, rooms occupied by other families, and general housekeeping issues.  *Id.*

The Hotel is certainly correct that there must be a logical connection between the breach and the damages, and plaintiffs have not done a particularly convincing job of demonstrating that it is likely that they will be entitled to a full recovery.  That said, the record as it stands (whether that record is viewed through the lens of the Hotel's motion or plaintiffs' motion) does

not allow us to decide as a matter of law whether there was a breach or not, the extent of any breach, and what portion of the $419,218, if any, is owed as a result of that breach.[15]  This aspect of the Hotel's motion for summary judgment is denied.

      **Extra costs stemming from the Event.**  The Hotel next focuses on costs plaintiffs say they incurred as a result of the problematic conditions at the Hotel.  For example, plaintiffs decided to add certain entertainment events totaling $93,748, and plaintiffs paid for "overflow accommodations" totaling $22,872.  DI 118-1 at 19.  The Hotel argues that these damages are barred as a matter of law because the contract does not oblige the Hotel to provide such services, and because there is no record evidence connecting these expenses to any particular breach of contract.  *Id.* at 19- 20.  Plaintiffs responds with citations to the record to document the underlying expenses and relies on the testimony of Mr. Greenwald to support the nexus between the expense and the alleged breach.  DI 129 at 28-30.  That is sufficient to forestall summary judgment on this category of damages.

      **Security Deposit.**  Finally, the Hotel seeks summary judgment that the Hotel is entitled to keep plaintiffs' $30,000 security deposit because the Hotel documented reimbursable expenses relating to the plumbing clogs and other problems, and there is no record evidence to contradict the Hotel's position.  DI 118-1 at 21.  Plaintiffs respond that the contract makes the

---

[15] Plaintiffs and the Hotel both dance around the problems posed by the parallel lawsuit brought by several Group members against the Hotel also before this court.  *Biderman v. Lancaster Host, LLC*, No. 23-cv-1308 (E.D. Pa.).  That suit is still in its infancy, but as best as we can tell, certain Group members are seeking refunds directly from the Hotel instead of through Greenwald or the Association.  Everyone agrees that the best course of action is to move forward with plaintiffs' claims in this case and stay *Biderman*.  *See* No. 23-cv-1308, DI 21. Obviously, there will never be any double recovery, and presumably, if plaintiffs recover any of the $419,218 in this case, it will be between plaintiffs and the Group members to work out what happens to that money.

Group members primarily liable for damages and that the record is not undisputed on the question of who caused the damage.  DI 129 at 30-34.  As discussed above with respect to plaintiffs' summary judgment motion, we agree that the Group members are primarily liable in the contract, but that does not resolve the security deposit dispute as a matter of law.  Further, we agree with plaintiffs that the record is not undisputed.  We deny the Hotel's motion with regard to the security deposit.

### B.   Declaratory Judgment Resulting in Recission (Count V)

The Hotel moves for summary judgment on plaintiffs' Count V, but there is some understandable confusion about what declaratory judgment plaintiffs are seeking.  Taking plaintiffs at their word, they seek:

> a declaration that their future performance of the Contract was excused by Defendant's material breaches, and therefore Plaintiffs are relieved of any obligation to "hold harmless" the Hotel or pay for "damages" supposedly caused by hotel guests or by either Plaintiff, or to have exercised renewal options in order to claim damages for the expense of obtaining new space for Passover Events.

DI 129 at 35.  After reviewing the above-quoted statement — which would not have been particularly obvious to us either — the Hotel takes its best shot at arguing why Count V should fail as a matter of law.  DI 137 at 17-19.  In the end, the fate of Count V cannot be resolved until all the factual issues in the case are resolved, and therefore, summary judgment is denied.

### C.   Declaratory Judgment Holding the Hotel Liable (Count VI)

The story with Count VI is much the same.  Here, plaintiffs seek

> a declaration that Defendant may not apply Plaintiffs' security deposit to cover the cost of repairing damage to the Hotel caused by Group Members (i.e., guests).  Plaintiffs also seek a declaration that the Contract's hold harmless clause does not apply to Defendant's claims concerning such damage.  Plaintiffs seek a declaration that any injuries caused to Group Members are the result of the Defendant's mismanagement of its Hotel, and point out the hold harmless clause was intended to apply to third party claims based on Plaintiffs' conduct, which is

34

what Defendant's counsel asserted when he drafted the clause.  Plaintiffs thus
seeks a declaration that any existing or future costs, injuries, etc., are ultimately
Defendant's responsibility.

DI 129 at 37 (citation omitted).  As with Count V, it is not entirely clear what plaintiffs are

driving at, but what is clear is that the central liability and damages issues in this case need to be

resolved first.  Therefore, summary judgment is denied.

## VI.    Conclusion

As explained, plaintiffs' motion for partial summary judgment (DI 120) is denied in its

entirety.  The Hotel's motions to exclude plaintiffs' experts (DI 122 & 135) are granted in part

and denied in part.  The Hotel's motion for summary judgment (DI 118) is granted in certain

respects.  The next step in this case is trial.[16]  This decision leaves open, generally, the questions

of liability for breach of contract and the appropriate amount of damages for any breach

established.

---

[16] This opinion was not a primer on effective advocacy and the proper use of Rule 56, but in attempting to reflect on why plaintiffs filed their ponderous yet entirely unmeritorious summary judgment motion, one line from the beginning of plaintiffs' opening brief jumps out: "This motion introduces the Court to the parties' discovery."  DI 120-1 at 2.  That is *not* what Rule 56 is for.  Nor is the rule an invitation to defendant for a written therapy session, however much one may be needed.  Counsel are reminded to make their pretrial submissions long on meaningful legal authority and short on invective.